IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

RAYMOND ARDLEY,

     Plaintiff,

vs.                       CASE NO. 1:16-cv-8-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability and disability insurance benefits ("SSDI") pursuant

to Title II of the Social Security Act ("the Act"). (ECF No. 1.) The

Commissioner has answered (ECF No. 8), and both parties have filed

briefs outlining their respective positions. (ECF Nos. 17, 18.) For the

reasons discussed below, it is recommended that the Commissioner's

decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed his application for SSDI on June 28, 2011,

alleging a disability onset date of November 19, 2010. (R. 181–82.) Plaintiff

alleged several impairments, including head injury, brain surgery,

dizziness, hearing loss, ringing in the ears, and blurry vision. (R. 196.) His

application was denied initially and upon reconsideration. (R. 135–46.)

Following a hearing on October 23, 2013, an administrative law judge

("ALJ") issued a decision unfavorable to Plaintiff. (R. 14–24.) The Appeals

Council denied Plaintiff's request for review. (R. 1–6.) On January 12,

2016, Plaintiff filed the instant appeal. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human

Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

     The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a

claimant's impairments (considering his residual functional capacity

("RFC"), age, education, and past work) prevent him from doing other work

that exists in the national economy, then he is disabled. 20 C.F.R. §

404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past

relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996,

1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001). The burden then temporarily shifts to the Commissioner to

demonstrate that "other work" which the claimant can perform currently

exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The

Commissioner may satisfy this burden by pointing to the Medical-

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the
> Commissioner. The Commissioner must produce evidence that
> there is other work available in significant numbers in the
> national economy that the claimant has the capacity to
> perform.  In order to be considered disabled, the claimant must
> then prove that he is unable to perform the jobs that the
> Commissioner lists. The temporary shifting of the burden to the
> Commissioner was initiated by the courts, and is not
> specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

Plaintiff's medical records begin in December 2007 after he was hit with a metal pipe on the head, right shoulder, and left forearm during a fight. (R. 264.) A CT-scan of his head revealed a right epidural hematoma and skull fracture over the hematoma. (R. 269.) An X-ray of his left hand revealed an old, healed fracture on his third finger. (R. 288.) X-rays of his right shoulder were unremarkable. (R. 289.)

Plaintiff underwent surgery for the epidural hematoma on December 8, 2007. (R. 272.) At his follow up on December 20. 2007, Plaintiff reported that his headaches were abating and that he was doing well. (R. 278.) In January 2008, Plaintiff reported no headaches. A CT-scan revealed no evidence of any residual epidural collection and that Plaintiff's bone flap was in good position. (R. 279–80, 365.)

In April 2010, Plaintiff went for a Pre-Placement Laborer Exam at

First Care of Gainesville with Scott A. Wilson, M.D. (R. 292–93.) Plaintiff reported that his health was the same this year as compared to the last. He described his current health as "excellent." He reported never having any fainting spells, seizures, dizziness that caused the room to spin, trouble with memory or coordination, or temporary loss of speech, vision, or body control. He denied having had any pain or discomfort in his chest or arms, nor pain in his back that prevented him from doing routine work. (R. 296.) Physical examination and a spirogram revealed normal findings. (R. 292.) He had distant vision and near vision of 20/20. (R. 293.)

Dr. Wilson completed an Examiner Conclusions worksheet for Plaintiff, in which he opined that Plaintiff had no disqualifying conditions and that Plaintiff could work with no restrictions. (R. 291.) Specifically, Dr. Wilson concluded that Plaintiff could frequently lift up to 50 pounds, walk or stand the entire day, shovel dirt, stone, and asphalt, and use various construction tools. (*Id.*) Additionally, Plaintiff could work in hot and humid conditions, be exposed to extreme weather, and operate heavy equipment. (*Id.*) Plaintiff also had visual acuity of at least 20/50 in the better eye and did not have any other disqualifying condition. (*Id.*)

Next, Eftim Adhami, MD, MS, evaluated Plaintiff on October 8, 2011.

Examination revealed visual acuity with lenses of 10/12.5 on the left and right eyes. Plaintiff's visual fields and eye movements were normal. Dr. Adhami observed that although Plaintiff "displays the picture of decreased hearing, but does not pay attention to look to interviewer's face as usually the people with hearing difficulties do; after a period of lo[]ss of face contact, patient jumps: 'what', trying to indicate that nothing was heard." (R. 304.) Straight leg testing was negative bilaterally, seated and supine, and there was no paravertebral muscle spasm. Sensation was normal throughout Plaintiff's body and he had 5/5 muscle strength in all muscles. He demonstrated a full range of motion in his joints. He also had a full range of motion in his back but had bulging lumbar vertebrae. Despite Plaintiff reporting that he used a cane for the last year because he sometimes loses his balance, Plaintiff's walk was normal. (R. 305.)

Dr. Adhami noted Plaintiff's prior brain surgery but concluded that function is fully recovered and that a cane is not necessary for regular walking. Dr. Adhami also noted that although Plaintiff has bulging vertebrae in his lumbar spine, Plaintiff is asymptomatic in that area. Dr. Adhami further concluded that although Plaintiff has hearing loss in some

frequencies, Plaintiff is able to sustain a normal conversation with appropriate effort. (*Id.*)

Plaintiff was referred to the Ocala Family Medical Center for a medical evaluation by Robert A. Williams, M.D., on December 5, 2011. (R. 309–11.) Plaintiff reported dizziness, vision loss, and hearing loss since 2003. He also reported dizziness, vision loss and hearing loss from the assault that rendered a skull fracture. Plaintiff said he had daily headaches that average at a seven or eight out of ten pain-wise. Although he would take up to 800mg of Advil for the pain, it helped little. He has gone to the emergency department for headaches or dizziness, the last time occurring in 2009. His dizziness comes and goes but he feels lightheaded all of the time. He has been unable to go for follow-up due to a lack of insurance and finances. (R. 308.) Plaintiff reported smoking a half a pack of cigarettes every day and drinking a few beers every day. (R. 309.)

Physical examination revealed that Plaintiff had a regular pulse and a blood pressure of 118/58. Plaintiff's pupils were equal and reactive to light and accommodation. Extraocular motions were normal and color vision was normal. Visual acuity with glasses measured at 20/30 in the right and

left eyes and 20/20 bilaterally. There was no nystagmus noted. Plaintiff's

ear canals were clear, he had normal tympanic membranes, and a hearing

test was within normal limits. (R. 309–11.)

Plaintiff demonstrated forward flexion to 50 degrees, extension to 60

degrees, lateral flexion right and left to 45 degrees, and right and left

rotation to 80 degrees in his cervical spine. Pain was noted more with

musculature than with the spine. He demonstrated forward flexion to 90

degrees, extension to 25 degrees, and lateral flexion right and left to 25

degrees in his thoracolumbar spine. Pain was noted over the right

sacroiliac and all ranges of motion were painful. With respect to his

shoulders, Plaintiff demonstrated forward elevation to 150 degrees,

abduction to 150 degrees, adduction to 30 degrees, external rotation to 90

degrees, and internal rotation to 80 degrees. He had 5/5 motor strength in

his shoulders but range of motion increased his neck pain. (*Id.*)

Plaintiff had no swelling, crepitus, or tenderness and maintained 5/5

motor strength in his forearms and wrists. He had 5/5 grip strength

bilaterally and his fine manipulation of hands was normal. There was,

however, mild degenerative joint disease noted in his hands. Plaintiff's

cranial nerves were grossly intact and there were no sensory or motor defects noted. Seated and supine straight leg raises were positive on the right and equivocal on the left. (*Id.*)

Plaintiff's gait was normal and he walked without assistance or without an assistive device. He could squat and heel-to-toe walk. Although Plaintiff brought his cane with him, he was able to complete the exam without it and Dr. Williams concluded that it is not medically needed. Pain was noted with walking, however. (*Id.*)

X-rays of Plaintiff's lumbar spine were also taken, which revealed early degenerative changes, straightening in the neutral position, and disc narrowing at L4–L5. (R. 307.) Dr. Williams assessed Plaintiff with residual dizziness, tinnitus, hearing loss, and vision loss by history. (R. 311.)

On May 2, 2012, Plaintiff called emergency services reporting acute onset, non-radiating chest tightness and pain, neck pain, and left arm pain. (R. 336.) Plaintiff was transported to Shands at UF. (R. 338.) Echocardiogram tests were abnormal and suggested acute inferior infarct and inferior ST duration/elevation, but the reports noted unconfirmed diagnosis. (R. 341–44, 347.) Echocardiogram tests performed later that

day were normal and suggested ST segment elevation that was probably a

normal pattern. (R. 324, 346–47, 349–52.) Chest x-rays taken that day and

on May 3, 2012, were unremarkable. (R. 322–23.) A transthoracic adult

echocardiogram performed on May 3, 2012, revealed borderline left

ventricular function, basal inferior and inferolateral hypokinesis, and normal

right ventricular systolic function. There was no evidence of

hemodynamically significant valve dysfunction. (R. 321.)

Plaintiff presented to Family Medical and Dental Centers on May 8,

2012, for a hospital follow-up and to establish care. (R. 315.) At the

appointment, Plaintiff reported receiving cardio stents in 2012. (R. 316.)

Plaintiff was referred to Dennis D. Dewey, MD, PA, a Neurologist, for

evaluation on December 16, 2013. Plaintiff reported experiencing heavy

pressure around his eyes with accompanying nausea, photosensitivity, left

hand numbness, tinnitus, lightheadedness, short term memory problems,

and daily headaches. He also complained of low back pain radiating into

his left leg. In addition, Plaintiff reported being recently admitted to UF

Shands after having blackouts. (R. 367–68.)

On evaluation, Plaintiff appeared to be in pain. An opthalmoscopic

exam revealed that both discs were sharp with well-defined margin and

that the corneal light reflex was equal. He had a regular heart rate and

rhythm with no murmur detected. Plaintiff used a cane for mobility and

demonstrated a mild lag in dorsiflexion of his left foot. Although he had

4–5/5 muscle strength in his upper extremities and 4/5 muscle strength in

his left foot, his muscle tone was normal. (*Id.*)

Neurologic exam revealed that Plaintiff was oriented to time, place,

and person, but had a poor memory of dates. He was, however, attentive

to questions and followed directions. Second cranial nerve testing showed

that Plaintiff's visual fields were full to confrontation. Third, Fourth, and

Sixth cranial nerve testing revealed intact extraocular movements. Fifth

cranial nerve testing revealed normal facial sensation. Seventh cranial

nerve testing indicated no facial asymmetry. Eighth cranial nerve testing

revealed that Plaintiff's hearing was normal to spoken word, but decreased

to finger rub and conductive loss in the left ear to tuning fork. Ninth cranial

nerve testing indicated that Plaintiff's uvula rises normally with phonation or

gag. Eleventh cranial nerve testing revealed a symmetrical shoulder shrug.

And twelfth cranial nerve testing showed that Plaintiff's tongue protrudes in

midline. Plaintiff had decreased vibratory and pinprick appreciation in his left hand and foot. Although a Romberg test was negative,[3] Plaintiff demonstrated abnormal heel and toe walking with a mild left foot drop. He also had poor fine motor coordination of his left hand. (*Id.*)

## B.  Opinion Evidence

### 1.  Dr. Stone

On December 21, 2011, Violet Acero Stone, M.D., a state agency consultant, completed a Physical Residual Functional Capacity Assessment for Plaintiff. Dr. Stone opined that Plaintiff can occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. In addition, Plaintiff can stand and/or walk for a total of 6 hours in an 8-hour workday, and sit for a total of 6 hours in an 8-hour workday. Furthermore, Plaintiff has no limitation with respect to pushing and or pulling. Likewise, Plaintiff has no postural, manipulative, visual, communicative, or environmental limitations. (R. 118–19.)

---

[3] A Romberg sign is "when a patient, standing with feet approximated, becomes unsteady or much more unsteady with eyes closed. Open, it is a sign of proprioception loss." *Stedmans Medical Dictionary* 820310 (2014).

## 2.  Dr. Dewey

On December 16, 2013., Dr. Dewey completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" for Plaintiff. Dr. Dewey opined that Plaintiff can occasionally lift up to 20 pounds if seated but never more, and occasionally carry up to 10 pounds but never more due to his back pain and poor balance. (R. 369.) Plaintiff can sit for 30 minutes without interruption, stand 15 minutes without interruption, and walk 15 minutes without interruption. (R. 370.) He can sit for four hours total, stand for one hour total, and walk for one hour total in an eight-hour workday. (*Id.*) For the remainder of the eight-hour workday, Plaintiff has to lay down due to back pain and headaches. (*Id.*) Plaintiff can walk ten to twenty feet without the use of a cane. (*Id.*) The cane, however, is medically necessary. (*Id.*) When he uses a cane, he cannot use his free hand to carry small objects. (*Id.*)

Dr. Dewey further opined that Plaintiff can occasionally reach, handle, finger, feel, push, and pull with his right hand, occasionally reach with his left hand, and can never handle, finger, feel, push, or pull with his left hand because he has poor fine motor coordination with his left hand.

(371.) Plaintiff, however, is right-handed. (*Id.*) He can occasionally operate foot controls with his right foot but can never do so with his left foot due to left leg weakness. (*Id.*) Plaintiff can occasionally climb stairs and ramps, kneel, and crawl, but can never climb ladders or scaffolds, balance, stoop, or crouch due to balance problems. (R. 372.)

Plaintiff should avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles because he has poor balance and needs new glasses. (*Id.*) Plaintiff also cannot read very small print or view a computer screen or determine differences in shape and color of small objects such as screws, nuts, or bolts due to needing new glasses. (*Id.*) He can, however, read ordinary newspaper or book print. (*Id.*)

Dr. Dewey opined that Plaintiff cannot go shopping, travel without a companion for assistance, or walk a block at a reasonable pace on rough or uneven surfaces. (R. 374.) He can, however, ambulate without using a wheelchair, walker, 2 canes, or crutches, use standard public transportation, and climb a few steps at a reasonable pace with the use of a single handrail. (*Id.*) Plaintiff can also prepare a simple meal and feed

himself, care for his personal hygiene, and sort, handle, or use paper/files. (*Id.*)

Dr. Dewey also opined that Plaintiff can occasionally tolerate exposure to humidity and wetness, dust, odors, fumes, and extreme heat. (R. 373.) He can never tolerate exposure, however, to unprotected heights or moving mechanical parts. (*Id.*) He also cannot tolerate exposure to extreme cold, vibrations, or noise due to his migraine headaches. (*Id.*) Plaintiff also should not operate a motor vehicle due to his recent blackout spells. (R. 373–74.)

## C. Other Evidence

A Summary FICA Earnings Query reveals that Plaintiff received $262.10 in earnings in 2011. (R. 190.) Similarly, according to a New Hire, Quarter Wage, Unemployment ("NDNH") Query, Plaintiff received unemployment benefits in the second and third quarters of 2011. (R. 191.) Then, on January 13, 2012, Plaintiff was hired by MDT Personnel, LLC ("MDT"). (*Id.*) Plaintiff received $3,222.70 in earnings from MDT for the first and second quarters of 2012. (R. 190–91.)

## D.  Hearing Testimony

At the hearing, Plaintiff was fifty-five (55) years old and lived with his wife and kids, including a seventeen year old son. (R. 82.) Plaintiff has been unable to work since November 2010 due to migraines, pain in his left leg and right shoulder, numbness in his left leg, and back pain. (R. 84.) In a given week Plaintiff only drives ten to fifteen miles. (R. 83.) He walks here and there but cannot do any serious work. (R. 84.)

Plaintiff has migraines daily. (*Id.*) They last anywhere from an hour to a half of a day, and maybe even all day. (*Id.*) When he gets a migraine he tries to relax away from the noise and ride it out. (*Id.*) Noise and crowds tend to trigger his migraines so he spends a lot of time at home. (R. 85.) If no one is home he typically does not get a migraine. (*Id.*) Plaintiff thinks his headaches came from being assaulted in 2009 when he was cracked on the head during an attempted robbery. (R. 86.) Now his balance is off, his vision has changed, and he gets the headaches. (*Id.*)

After the assault, Plaintiff went back to work as a roller operator. (R. 86–87.) But, after he started migraine medication, he became bad in traffic. (R. 87.) He also suffered a heart attack in 2010, which led to additional

heart medication. (*Id.*) All the medication, however, started preventing him from doing his job because they caused drowsiness, dizziness, lightheadeness, misfunction, and poor judgment. (*Id.*) Plaintiff still experiences lightheadedness and dizziness on a daily basis whenever he moves. (R. 88–89.) It becomes worse, however, with rising and sitting and going from one position to the next. (*Id.*) He was prescribed a cane in approximately January 2014, which he uses now to help with his balance. He used a cane prior to that but only when he was alone. (R. 92–93.) Instead, he would lean on his wife. (R. 93.)

With respect to the ringing in his ears, the ringing never goes away. (R. 89.) Plaintiff tried medication, which did not work. (*Id.*) The ringing constantly distracts him and interferes with his concentration. (*Id.*) He loses focus for a couple hours a day as a result of the ringing by either forgetting things or not paying attention. (R. 90.)

As far as Plaintiff's back pain, the pain is in the lower back. (R. 85.) His back pain is constant. (*Id.*) Sometimes it also moves down into his legs, and is worse in the right leg. (R. 86.) He has had leg pain for the last three or four years, but it is getting worse. (R. 93.) On a scale of one to ten,

his back pain ranges from a three to a five. (R. 86.) He can bend at the waist but he has trouble if he bends to lift something. (R. 90.) Since November 2010 he has not lifted more than fifteen to twenty pounds. (*Id.*)

Plaintiff's energy level has also significantly decreased since November 2010. (*Id.*) He tries to do things in the house here and there to help his wife but gets tired easily. (*Id.*) He is, however, able to take care of himself. (*Id.*) Whenever he travels, he goes with his wife and son because otherwise he would lose his balance or forget where he is. (*Id.*) He does not grocery shop on his own. (*Id.*)

Plaintiff has not done any work for pay since November 2010. (R. 94.) In 2012, however, he made $3,200 with MDT Personnel doing janitorial work. (*Id.*) He only worked for approximately three months. (*Id.*) He tried to go back but they found out about all the medications. (*Id.*)

## E.  The ALJ's Findings

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014. (R. 16.) He further determined that Plaintiff had not engaged in substantial gainful activity since November 19, 2010. (*Id.*) The ALJ found that Plaintiff

had the following severe impairments: migraine headaches with a history of

cerebral trauma with right craniotomy evacuation for an epidural hematoma

in 2007. (*Id.*) At step three of the sequential evaluation, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met

or medically equaled one of the listed impairments. (R. 17.)

With respect to Plaintiff's residual functional capacity at step four of

the sequential evaluation, the ALJ determined that Plaintiff retained the

residual functional capacity ("RFC") to perform medium work as defined in

20 C.F.R. §§ 404.1567(c), with limitations. (*Id.*) Specifically, Plaintiff must

avoid concentrated exposure to hazards (e.g., unprotected heights and

dangerous machinery (i.e., moving parts)). In addition, Plaintiff can only

occasionally climb ramps and stairs, and can never climb ladders, ropes,

and scaffolds. Further, Plaintiff can only occasionally balance, stoop, kneel,

crouch, and crawl. (*Id.*)

The ALJ concluded that Plaintiff's medically determinable

impairments could reasonably be expected to cause Plaintiff's alleged

symptoms, but that Plaintiff's statements concerning the intensity,

persistence, and limiting effects of his symptoms were not entirely credible.

(R. 18.) The ALJ concluded at step four that Plaintiff is capable of

performing past relevant work as a roller operator. (R. 22.) The ALJ further concluded that there are also other jobs existing in the national economy that Plaintiff is also able to perform. (*Id.*) Accordingly, the ALJ concluded that Plaintiff has not been under a disability from November 19, 2010, through the date of the ALJ's decision. (R. 24.)

## IV.  DISCUSSION

Plaintiff raises two issue on appeal: (1) whether the ALJ violated the Eleventh Circuit's pain standard; and (2) whether the ALJ erred in giving Dr. Dewey's opinion little weight. (ECF No. 17.) In response, Defendant contends that substantial evidence supports the ALJ's credibility finding, as well as the ALJ's decision to give little weight to Dr. Dewey's opinion. (ECF No. 18.)

## A.    Substantial evidence supports the ALJ's credibility finding.

At step four the ALJ must assess the claimant's RFC and his ability to return to past relevant work. § 404.1520(a)(4)(iv). The ALJ must take the claimant's medical evidence and other evidence into consideration in his RFC analysis. § 404.1520(e). If a claimant cannot return to his past relevant work, the ALJ moves onto step five to determine if the claimant can adjust to other work. *Id.*; *Phillips v. Barnhart*, 357 F.3d 1232, 1238

(11th Cir. 2004).

In determining Plaintiff's RFC at step four, the ALJ determined that although Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 18.) The ALJ was, therefore, required to consider Plaintiff's statements under the Eleventh Circuit's three-part pain standard.

Under the Eleventh Circuit's pain standard, a claimant may establish his disability through his own testimony of pain or other subjective symptoms. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *Foote v. Chater*, 67 F.3d 1553, 1560–61 (11th Cir. 1995). The ALJ must consider a claimant's testimony of pain and other subjective symptoms where the claimant meets the Eleventh Circuit's three-part "pain standard." *See Foote*, 67 F.3d at 1560. Under that test, evidence of an underlying medical condition must exist. *Id.* If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a

severity that it can reasonably be expected to give rise to the alleged pain or symptoms. *Id.* A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability. *Id.* at 1561.

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce his symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and his doctors. *Id.* § 404.1529(c)(1)–(2). The ALJ may consider other factors, such as: (1) The claimant's daily activities; (2) The location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) Any precipitating and aggravating factors; (4) The type, dosage, effectiveness, and side effects of the claimant's medication; (5) Any treatment other than medication; (6) Any measures the claimant used to relieve his pain or symptoms; and (7) Other factors concerning the claimant's functional limitations and restrictions due to his pain or symptoms. *Id.* § 404.1529(c)(3). The ALJ then will examine the claimant's

statements regarding his symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record. *Id.* § 404.1529(c)(4).

If the ALJ decides not to credit the claimant's testimony as to his subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *See Foote*, 67 F.3d at 1561–62. While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was incredible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id*. at 1562. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs*., 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence. *Foote*, 67 F.3d at 1562. The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case*. Id.*

The ALJ is not required to recite the pain standard, but he must make

findings that indicate the standard was applied. *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013). Whether objective medical impairments could reasonably give rise to the alleged pain is a question of fact for the Commissioner and the district court's review is limited to ensuring substantial evidence supports the Commissioner's finding. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

In this case, at step four, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 18). Thus, under the second prong, the ALJ was required to consider the credibility of Plaintiff's testimony regarding pain. *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988).  The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 18.) The ALJ went on to explain that "[s]ome of the evidence supports the claimant's allegations, but there are inconsistencies that detract from his credibility." (*Id.*) Substantial evidence supports the ALJ's reasons for discrediting Plaintiff's statements.

In assessing Plaintiff's credibility, the ALJ properly considered Plaintiff's work history after the alleged disability onset date. When

evaluating a claimant's subjective testimony regarding pain, an ALJ may consider a claimant's work history after the alleged onset date regardless of whether the work was part-time or full-time. *See* 20 C.F.R. § 404.1571 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. . . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Cooper v. Comm'r of Soc. Sec.*, 512 F. App'x 803, 808 (11th Cir. 2013) (explaining that the ALJ properly noted plaintiff's continuing employment at near-substantial gainful activity levels may suggest that she could do more work than she actually did); *Hagan v. Colvin*, No. 1:14-cv-00293-AKK, 2014 WL 7403952, at *5 (N.D. Ala. Dec. 30, 2014) (concluding that the ALJ properly considered plaintiff's part-time work after the alleged onset date in weighing his credibility); *Clapp v. Astrue*, No. 3:06cv334/MCR/EMT, 2008 WL 275880, at *12 (N.D. Fla. Jan. 31, 2008) (explaining that it was proper for the ALJ to consider work activity after the alleged onset date, which may be inconsistent with a claimant's claim of disabling pain).

The ALJ discussed that Plaintiff engaged in—at least—part-time

work in 2011 and 2012 despite his alleged onset date of November 19, 2010. Although this does not necessarily suggest that Plaintiff is capable of substantial gainful activity, it was nonetheless proper for the ALJ to conclude that this part-time work suggests Plaintiff's symptoms may not be as limiting as alleged.

The ALJ also pointed out that Plaintiff received unemployment benefits in 2011. In evaluating a claimant's credibility, an ALJ may consider a claimant's application for, and receipt of unemployment benefits. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161–62 (9th Cir. 2008) (acknowledging that receipt of unemployment benefits can undermine a claimant's alleged inability to work full-time); *Peden v. Astrue*, No. 2:12-cv-00081-AKK, 2012 WL 5379172, at *5 (N.D. Ala. Oct. 31, 2012) (plaintiff's application for unemployment benefits application detracted from her credibility); *George v. Astrue*, No. CV-11-S-3518-M, 2012 WL 3030157, at *4–5 (N.D. Ala. July 20, 2012) (concluding that the ALJ properly considered plaintiff's receipt of unemployment benefits in evaluating plaintiff's credibility). As the ALJ correctly noted, although "receipt of unemployment benefits does not prove the ability to work," it is nonetheless discordant with a disability allegation because "to receive

unemployment benefits, an individual must certify that he is ready, willing, and able to work." (R. 21); *see* Fla. Stat. § 443.091(1)(d) ("An employed individual is eligible to receive benefits for any week only if the Department of Economic Opportunity finds that . . . he is able to work and is available for work.").  Accordingly, the ALJ properly considered Plaintiff's receipt of unemployment benefits after his alleged onset date when evaluating Plaintiff's credibility. *See Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801–02 (6th Cir. 2004) (noting that applications for unemployment and disability benefits are inherent inconsistencies which may be considered in evaluating a claimant's credibility); *see also* 20 C.F.R. § 404.1529(c)(4) (in evaluating alleged symptoms and pain, the ALJ "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence").

The ALJ also considered Plaintiff's inconsistent statements, which further suggests that his condition may not be as disabling as alleged. For example, although Plaintiff testified that he was prescribed a cane in 2014 but was using a cane prior to that, his medical records demonstrate that he was using a cane as early as 2010. (R. 305.) Notably, however, the

medical records also demonstrate that the cane was not medically necessary. (R. 305, 309–11.) Similarly, despite Plaintiff's testimony that his right leg pain began in 2010 through 2011, the consultative examinations during that period do not establish significant leg pain and Plaintiff demonstrated a normal gait upon examination. (R. 291–96, 305, 309–11.)

In addition, the ALJ pointed to the lack of medical evidence to support Plaintiff's testimony that he suffered a heart attack in 2010. The medical evidence does evidence that Plaintiff sought emergency medical attention in May 2012 for chest pain and that the reports suggested acute inferior infarct and inferior ST duration/elevation. (R. 341–43, 347, 354.) While Plaintiff contends that he merely "got the year wrong," the ALJ did indeed consider the May 2012 records and echocardiogram studies in his analysis. Notably, however, the records do not conclusively evidence heart attack nor are there any records of Plaintiff receiving a confirmed diagnosis of heart attack; instead, the echocardiogram results suggested that ST segment elevation was probably a normal pattern. (R. 324, 346–47, 349–52.) Although misleading testimony and inconsistent statements may not be the result of a conscious intent to deceive the ALJ, it is nonetheless the province of the ALJ to resolve conflicts in the evidence. *Wheeler v.*

*Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986).

In discounting the severity and intensity of Plaintiff's claims of pain, the ALJ also considered Plaintiff's inconsistent medical care over the years. *See* SSR 96-7p SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996) (superseded by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016) (explaining that in assessing the individual's credibility, his "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"); *Brown v. Comm's of Soc. Sec.*, 425 F. App'x 813, 817 (11th Cir. 2011) ("One factor that the ALJ may consider [in making a credibility determination] is the level of treatment sought by the claimant."). In 2008, the only medical records are from January, at which time Plaintiff did not have headaches and had recovered well from his December 2007 surgery. (R. 279–80, 365.)[4] There are no medical records from 2009 or

---

[4] "However, the ALJ may not draw an adverse inference from a claimant's lack of medical treatment without first considering the claimant's explanation for his failure to seek treatment." *Brown*, 425 F. App'x at 817. A claimant's poverty can excuse his noncompliance with medical treatment. *Id.* (citing *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988)). In this case, it is unclear whether the ALJ first considered, or even sought, Plaintiff's explanation for the lack of medical treatment in 2010 and 2011. Nonetheless, Plaintiff does not raise this issue in his brief and it is therefore, waived. *See Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013) (noting that plaintiff waived particular arguments by not expressly challenging the ALJ's findings).

Even if Plaintiff had raised this issue, however, such would not warrant reversal. *See Brown*, 425 F. App'x at 817 (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th

2010, other than from his April 2010 Pre-Placement Laborer Exam, at which time Dr. Wilson opined that Plaintiff had no disqualifying conditions and that Plaintiff could work with no restrictions. (R. 291–96.) Then in 2011, other than Plaintiff's self-completed function report in September, there are also no medical records until his examination by Dr. Adhami in October.

The ALJ further considered the absence of work-related limitations placed on Plaintiff by a treating physician. A lack of medical reports indicating exertional limitations suggests that a claimant's impairments may not be as limiting as alleged. *See Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial evidence supported

---

Cir. 2003)) (if a claimant's failure to follow or seek medical treatment "is not one of the principal factors in the ALJ's decision, the ALJ's failure to consider the claimant's ability to pay will not constitute reversible error"). Here, it is clear that Plaintiff's lack of medical treatment was not one of the principal factors in the ALJ's credibility determination. Instead, the ALJ gave numerous reasons for his credibility determination as discussed throughout this report and recommendation. *See id.* (ALJ's failure to consider the claimant's ability to pay was not reversible error because the main reason the ALJ discredited the claimant's testimony was the relatively conservative pattern of treatment as opposed to the gap in medical treatment). Notably, the ALJ dedicated a mere one sentence to this reason within the four and a half pages dedicated to the RFC and credibility determination. (R. 21 ("Despite his allegations of disabling symptoms and medication side effects, it appears that the claimant has not received consistent or ongoing medical care over the years.").) Thus, although the ALJ considered Plaintiff's inconsistent medical treatment in making his credibility determination, such does not constitute reversible error.

the ALJ's conclusion that plaintiff's impairments were not severe because there were no reports indicating exertional limitations). As the ALJ noted, the record does not contain a medical source statement or any other similar document from any of Plaintiff's treating physicians.

The ALJ also expressly discussed and relied upon substantial objective medical evidence to support his credibility determination. *See* § 416.929(c)(2); *see also Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole."). A lack of medical reports indicating exertional limitations suggests that a claimant's impairments may not be as limiting as alleged. *See Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial evidence supported the ALJ's conclusion that plaintiff's impairments were not severe because there were no reports indicating exertional limitations). Specifically, the ALJ noted that in January 2008, more than a month following his craniotomy, Plaintiff reported no headaches and that he was doing well. A CT scan of his head revealed no

sign of any residual epidural collection and that the bone flap was in good position. At his exam by Dr. Wilson in April 2010, Plaintiff had 20/20 vision, spirometry testing was normal, and physical examination was normal. Thus, Dr. Wilson determined that Plaintiff was capable of working with no restrictions.

Although Plaintiff reported decreased hearing, ringing in the ears, numbness on the left side, and headaches in October 2011, examination revealed that Plaintiff's heart had normal sounds, his cranial nerves were fully functional, he had a negative straight-leg raise, no paravertebral muscle spasm, a full range of motion in his back, a normal gait, normal sensory, reflex, and strength tests, and could walk on heels and toes. Furthermore, Dr. Adhami noted that Plaintiff displayed the picture of decreased hearing but did not look to the interviewer's face as people with hearing difficulties usually do. Similarly, although Plaintiff had bulging vertebrae in his lumbar spine, he was asymptomatic.

Examination by Dr. Williams in December 2011 revealed that Plaintiff had 20/30 vision with glasses, a normal gait, and could heel to toe walk. Hearing tests were normal and other than a positive straight-leg raise on the right and an equivocally positive test on the left, Plaintiff had few

neurological deficits.

In May 2012, despite some abnormal echocardiogram tests, further studies suggested that ST elevation was probably a normal pattern. Moreover, a chest X-ray was normal. More than a year later, in December 2013, examination by Dr. Dewey revealed no abnormalities on cardiovascular examination. In addition, although Plaintiff had a mild lag in the dorsiflexion of his left foot, his muscle strength was 4/5 in the left foot, Plaintiff had 4–5/5 muscle strength in his upper extremities, and he had normal muscle tone. Plaintiff's hearing was also normal to spoken word.

An independent review of the record further reveals that although Plaintiff reported daily headaches that average at a seven or eight out of ten pain-wise in December 2011, Plaintiff represented that he had not gone to the emergency room for headaches since 2009. Notably, there are no records evidencing Plaintiff seeking emergency room attention for headaches in 2009 or any other time after his skull injury in 2007. In addition, in December 2013, a neurologic exam was largely normal. Plaintiff was oriented to time, place, and person, and was attentive to questions and followed directions. His visual fields were full to confrontation and Plaintiff demonstrated intact extraocular movements.

Plaintiff had normal facial sensation and no facial asymmetry. Moreover, despite complaints of lightheadedness, a Romberg test for proprioception loss was negative.

Finally, the ALJ pointed to opinion evidence that is at odds with Plaintiff's statements about the limitations imposed by his pain. *See* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1) (explaining that in evaluating the intensity and persistence of a claimant's symptoms, the Commissioner considers all of the available evidence, including the "medical opinions of your treating source and other medical opinions").

For example, the ALJ gave great weight to Dr. Stone's opinion. (R. 22.) The ALJ noted that Dr. Stone is an expert in reviewing disability claims under the Social Security Act. *See* 20 C.F.R. § 404.1527(c)(5) (providing that when evaluating opinion evidence, the ALJ may consider whether the source has an understanding of the SSDI program). The ALJ concluded that Dr. Stone's opinion was the most consistent with the record as a whole.

Indeed, in April 2010, Plaintiff could perform routine work, had a normal physical examination, a normal spirogram, and 20/20 vision. (R. 292–93.) In October 2011, Plaintiff had visual acuity with lenses of 10/12.5,

normal visual fields and eye movements, and could sustain a normal conversation despite some hearing difficulties. Plaintiff had 5/5 muscle strength in all muscles, normal sensation, and a full range of motion in his joints. Plaintiff could walk normally without using his cane. (R. 304–05.)

Then in December 2011, Plaintiff's extraocular motions were normal, color vision was normal, and visual acuity was 20/20 bilaterally. A hearing test was normal. Range of motion was somewhat limited but largely normal. Plaintiff had 5/5 motor strength in his shoulders, forearms, wrists, and with respect to grip. Although mild degenerative joint disease was noted in his hands, Plaintiff nonetheless had fine manipulation of his hands. Cranial nerves were grossly intact and there were no sensory or motor defects noted. Plaintiff's gait was normal, he could walk without a cane, and he could squat. (R. 309–11.) Moreover, despite early degenerative changes in Plaintiff's spine, Dr. Williams only diagnosed Plaintiff with various impairments by history. (R. 311.)

In December 2013, the opthalmoscopic exam also was normal, Plaintiff had a regular heart rate and rhythm, and no murmur was detected. Although Plaintiff used a cane he had 4–5/5 muscle strength in his upper extremities, 4/5 muscle strength in his left foot, and normal muscle tone.

Neurologic examination was largely normal other than decreased vibratory and pinprick appreciation in his left hand and foot. Plaintiff also had a negative Romberg test. (R. 367–68.)

In sum, substantial evidence supports the ALJ's credibility determination. The ALJ has wide latitude in evaluating the weight of evidence, particularly the credibility of witnesses. *Owens v. Heckler*, 748 F.2d 1511, 1514 (11th Cir. 1984). And where, as here, substantial evidence supports the ALJ's credibility determinations, the Court cannot overturn the ALJ's findings.

## B.   The ALJ properly considered Dr. Dewey's opinion.

When determining the weight to give to a physician's opinion, an ALJ considers numerous factors, including the examining relationship, treatment relationship, supportability, consistency, specialization, and other factors. § 404.1527(c). Generally, more weight is given to the opinion of a source that has examined the claimant than to the opinion of a non-examining source. § 404.1527(c)(1). However, more weight is generally given,

> to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and

> may bring a unique perspective to the medical evidence that
> cannot be obtained from the objective medical findings alone or
> from reports of individual examinations, such as consultative
> examinations, or brief hospitalizations.

§ 404.1527(c)(2). "The more a medical source presents relevant evidence

to support an opinion, particularly medical signs and laboratory findings,

the more weight we will give that opinion." § 404.1527(c)(3). In addition, the

better a source explains his opinion and the more consistent the opinion is

with the record as a whole, the more weight the opinion will be given. §

404.1527(c)(3)–(4). Similarly, more weight is generally given to the opinion

of a specialist pertaining to medical issues in his area of specialty than to

the opinion of a non-specialist source. § 404.1527(c)(5). The ALJ may also

consider other factors in evaluating opinion evidence, such as whether the

source has an understanding of the SSDI program and the extent to which

the source is familiar with other information in the claimant's case record. §

The opinion of a one-time examiner is not entitled to deference.

*McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). Nonetheless, "the

ALJ must state with particularity the weight given to different medical

opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631

F.3d 1176, 1179 (11th Cir. 2011). "In the absence of such a statement, it is

impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id.* (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

Here, the ALJ explicitly discussed Dr. Dewey's opinion— that Plaintiff's combined sitting, standing, and walking capacity would be less than eight hours a day— and gave the opinion "less weight." (R. 21.) The ALJ expressly articulated a number of reasons for giving Dr. Dewey's opinion less weight.

First, the ALJ noted that "Dr. Dewey based his opinion on a one-time examination, and he did not have insight into the claimant's longitudinal medical history." (*Id.*) Although Plaintiff has an alleged onset date of November 19, 2010, Dr. Dewey only examined Plaintiff once on December 16, 2013.  Notably, the record does not suggest that Dr. Dewey had the benefit of Plaintiff's complete medical history and bases his report on Plaintiff's subjective complaints. *See* § 404.1527(c)(2); *see also Wainwright v. Comm'r of Soc. Sec.*, No. 06-15638, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (one-time examining source's opinion was not entitled to any special weight because he examined the claimant only

once, was not a treating physician, and it was contradicted by the other medical evidence). Although Plaintiff contends that the Commissioner should have provided Plaintiff's entire medical history to the consulting specialist, Plaintiff has not provided any authority to support this position. *Cf. Huhn v. Astrue*, 2009 WL 804646, at *12 (M.D. Fla. Mar. 26, 2009) ("However, as with any consultative examination, the opinion of a one time consultative examiner is not accorded the same weight as the opinion of a treating physician, who has a longitudinal history with the claimant.").

Second, the ALJ explained that "Dr. Dewey's limitations are not fully consistent with his objective findings and appear to be based largely on the subjective complaints by the claimant." Indeed, although Dr. Dewey opined that Plaintiff can only sit for a total of 4 hours, stand for a total of 1 hour, and walk for a total of one hour in an eight-hour workday and has to lay on a bed with back pain and headaches for the remainder of the eight-hour day, Dr. Dewey's objective findings evidence only some generalized pain during the examination and nothing pertaining to headaches. Similarly, although Dr. Dewey opined that Plaintiff can only occasionally lift up to 20 pounds and never more, and can only occasionally carry up to 10 pounds and never more due to back pain and balance problems, Dr. Dewey's

physical examination does not evidence limitations to support this finding

Instead, Dr. Dewey's examination revealed normal muscle tone in

Plaintiff's extremities and a negative Romberg test.

Similarly, although Dr. Dewey opined that Plaintiff has a visual

impairment, his examination revealed normal visual findings. Notably, Dr.

Dewey based his conclusion that Plaintiff has a visual impairment on the

fact that Plaintiff "needs new glasses." (R. 372.) In short, Dr. Dewey's

limitations appear to be based largely on Plaintiff's subjective reports.

Where, as here, the ALJ finds the claimant is not credible, a physician's

opinion based entirely on the claimant's subjective statements is not

entitled to controlling weight. *See Carter v. Comm'r of Soc. Sec.*, 411 F.

App'x 295, 299 (11th Cir. 2011) (ALJ properly discounted the treating

physician's opinion based on claimant's subjective complaints where the

ALJ found the claimant not to be credible).

Third, in discounting Dr. Dewey's opinion the ALJ found that "Dr.

Dewey's limitations are inconsistent with other consultative examinations at

Exhibits 3F and 4F, and the earlier examinations appear to be closer to the

record, as a whole."[5]  Substantial evidence supports this finding.

For example, Dr. Dewey opined that Plaintiff can only sit for four hours total, stand for one hour total, and sit for one hour total in an eight-hour workday, and can only occasionally lift up to 20 pounds and occasionally carry up to 10 pounds. However, in contrast Dr. Adhami's examination revealed largely normal findings.  Dr. Adhami concluded that Plaintiff had fully recovered from the brain surgery, Plaintiff could walk normally without a cane, and that although Plaintiff had bulging vertebrae in his lumbar spine, he was asymptomatic. (R. 304–05.)

Likewise— with the exception of some mild degenerative joint disease in his hands, positive straight leg raises, and some pain in his lumbar spine and with walking— Dr. Williams' examination also revealed largely normal findings. (R. 309–11.)  Notably, neither Dr. Adhami nor Dr. Williams suggested that Plaintiff had any functional limitations with respect to sitting, standing, walking, lifting, or carrying, nor did they suggest that Plaintiff had any visual limitations. *See Russell v. Astrue*, 331 F. App'x 678, 681–82 (11th Cir. 2009) (holding that the ALJ had good cause for giving

---

[5] Exhibit 3F contains the October 2011 medical records from Dr. Adhami. (R. 300–05.) Exhibit 4F contains the December 2011 medical records from Dr. Williams. (R. 306–11.)

little weight to the examiner's opinion where the ALJ appropriately found that the plaintiff's other medical records failed to support the opinion and the examiner's own examination contradicted his opinion).

Fourth, the ALJ explained that "Dr. Dewey's limitations are also inconsistent with the treatment notes, with indications in the record that the claimant would be able to lift up to 50 pounds." Although the evidence that Plaintiff could lift up to 50 pounds was from April 2010—prior to the alleged onset date—substantial evidence nonetheless supports the ALJ's conclusion that Dr. Dewey's limitations are inconsistent with Plaintiff's treatment notes for the reasons previously explained. *See* § 404.1527(c)(3) (the more consistent an opinion is with the record as a whole, the more weight it will be given).

Fifth, in discounting Dr. Dewey's opinion the ALJ found that, "Dr. Dewey did not explain the reasons for his most severe limitations and did not explain why he found the claimant's condition to be more limiting than other physicians did."  As discussed, Dr. Dewey's functional limitations appear to be based largely on Plaintiff's subjective reports rather than upon specific medical evidence or examination findings. And while Dr. Dewey opined that Plaintiff can only occasionally reach, handle, finger, feel, push,

and pull with his *right* hand—his dominant hand—Dr. Dewey offered no findings to support this assessment; instead, Dr. Dewey merely stated "poor fine motor coordination [*left*] hand." (R. 371.)

Similarly, despite Dr. Dewey's assertion that Plaintiff can only occasionally operate foot controls with his *right* foot, Dr. Dewey's reasoning was based entirely on the finding that "patient has [*left* lower extremity] weakness." (*Id.*) These findings are wholly unsupported. *See* § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Finally, contrary to Plaintiff's assertion, the ALJ's failure to specifically address each of Dr. Dewey's specific opinions does not warrant reversal. Plaintiff points to five specific sub-opinions contained throughout the six-page Medical Source Statement that Dr. Dewey completed for Plaintiff and argues that the ALJ should have addressed each of those aspects. Plaintiff offers no authority to support this position. There is no requirement that an ALJ expressly address every comment by a medical doctor, nor could he. *See Cowart*, 662 F.2d at 735 (an ALJ's opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the

relevant evidence before him its due regard).  Rather, where, as here, an

ALJ has decided to give little weight to an examiner's opinion and has

articulated specific reasons the evidence supports his decision, the ALJ is

not required to comb through every sentence of the examiner's opinion and

recite his analysis for each individual sub-opinion.

Furthermore, the ALJ did impose certain limitations on Plaintiff's

RFC, which include several of the sub-opinions that Plaintiff contends the

ALJ ignored. For example, Plaintiff claims the ALJ did not address Dr.

Dewey's opinion that Plaintiff cannot avoid ordinary hazards in the

workplace and has balance problems. The ALJ, however, accounted for

this limitation in the RFC by including the limitation that Plaintiff must avoid

concentrated exposure to hazards, and can only occasionally climb ramps

and stairs, balance, stoop, kneel, crouch, and crawl, and can never climb

ladders, ropes, or scaffolds. (R. 17, 22.)

For these reasons, the Court has no trouble concluding that the ALJ

properly considered Dr. Dewey's opinion and that the ALJ's decision to

accord Dr. Dewey's decision less weight is fully supported by substantial

evidence.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 7th day of December,

2016.


*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations
must be filed within fourteen (14) days after being served a copy
thereof. Any different deadline that may appear on the electronic
docket is for the court's internal use only, and does not control. A
copy of objections shall be served upon all other parties. If a party
fails to object to the magistrate judge's findings or recommendations
as to any particular claim or issue contained in a report and
recommendation, that party waives the right to challenge on appeal
the district court's order based on the unobjected-to factual and legal
conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**